May it please the Court, David Force for the Plaintiff Appellant, and I would like to reserve five minutes. I would suggest to the Court that this also is not a case that you deal with every day, in that I believe this is the first Title IX retaliation case, at least, that would reach a presidential decision in this Court that has come up since the U.S. Supreme Court recognized the existence of such claims. There has never been a case under the Oregon Educational Discrimination Statute before a federal court at all prior to this one, so far as I'm able to determine. The issues about jurisdiction and the discretion of the district court are obviously more common, although I've also been unable to find any authority, as I understand the State has, for a situation in which a notice of removal is filed that does not identify the court in which the action is proceeding, and, in fact, identifies a different court in a different division of the district court within 30 days. Why don't we get to the Title IX issues? All right. Are you contesting that this – are you arguing that Title IX is going to – is broader than Title VII and that the burden shifting and all of that regime that's accrued under Title VII wouldn't be applicable here? I would not say that the procedures are inapplicable, but I believe the substantive standard of what is protected activity is different, just as it is in other kinds of retaliation cases like First Amendment cases, where you might follow the same procedure. But the question is what is protected activity, and I think it's clear under this Court's decision in the Mansourian case that it doesn't mean that you actually have to file a Title IX complaint against somebody in order to preserve the right to proceed on a claim either for accommodation or retaliation that's simply based on what may be de facto disparate treatment in education related to sex. And I would suggest that in the Paxson case that – in which the Supreme Court first recognized the retaliation claim could occur, I don't think there's very much doubt that that school district couldn't afford separate gymnasiums for the boys' and girls' sports teams. It's simply that the complaint of the coach of the girls' team that it didn't seem fair that the boys got to use the gym and the girls didn't for practices gave him a right of action for retaliation. And that's much different than saying he had to establish that the district committed sex discrimination. The district probably couldn't afford anything different. And in the Mansourian case, I think that's really obvious, that the University of California could not afford equal expenses for the two teams. It had to drop one or the other. Okay, but you've – as you said, this is a retaliation case. Correct. So we have precedence in the Title VII regime, whether there's a prima facie case, whether there is enough to get past that hurdle, and whether there are legitimate non-discriminatory justifications, whether there's pretext. Where does this case fit into that on the record as it exists here? Okay, I believe it fits in this way. The protected activity was simply Ms. Imeldi's contentions to the university, to various people, but primarily to Dean Bullis of the College of Education and to Marion Freestad, the acting dean of the graduate school, that she was being deprived of an equal opportunity to obtain a Ph.D. in the special education program because Dr. Horner was non-responsive to her in comparison to the way he responded to his male Ph.D. students. And she communicated that concern how? She communicated that concern initially in a lengthy verbal conversation with Ms. Freestad, which Ms. Freestad then immediately called Dr. Horner and told him what she had said, and according to Dr. Horner himself – Is that in dispute, whether she immediately called Dr. Horner? No, as a matter of fact, in the supplemental excerpt of record that the defendant filed, there's Dr. Horner's email string of communications with Dean Bullis in which he says that the first he knew of this was when Freestad called him, and he then immediately that same day withdrew as her advisor or chair. There's a difference. So the initial complaint was in the communication with Freestad. She called Horner or emailed him or both or whatever? That's the initial complaint. And then he resigned. So you're saying the same day, basically. Yes. And then one week later, after he also has had a communication both by email and verbally, Now his statement, as I recall, just to make sure I'm understanding this, he said given that, to the effect that, I don't know if he said then or whatever, but he said that basically she isn't, you know, I've given her suggestions, but she doesn't want my suggestions, so I resign as I don't think I should be her master professor, supervising professor. Yeah, that's what he said to her. And what he said to Dean Bullis the next day in the email was that if she feels I'm obstructing her, I don't want to be her chair. So why is that retaliation? Well, it's retaliation because the communication that he learned of to Freestad that day was the plaintiff telling Dean Freestad that Horner was obstructing her by not giving her the same respect and support, institutional support, that he was giving to his male PhD students. They're saying that that is protected activity, right? When she complains to Freestad that Horner isn't giving me the support that he gives to male PhD candidates, that's a protected expression. I believe so. Then I guess Judge Fisher was saying, why is his resigning an adverse employment action? Well, it's not an employment action at all. She wasn't an employee. This is an act of discrimination. It was an act of retaliation because it ultimately, of course, many things happened subsequently where she tried to get other people to replace him and so forth, and one week after he withdrew, he addresses the faculty without her knowledge and says she shouldn't get a PhD from this institution. Is that disputed by him? No. As a matter of fact, he said he could not recall. I misspoke in saying adverse employment action. In this Title IX context, I guess it's an adverse educational action of some kind. Why does his resigning block her from the PhD program? In and of itself, it would not, but once nobody else would agree to replace him and the university therefore terminated her PhD program and her enrollment at the university, that certainly was the end of her PhD program, and that's not disputed at all. She said that she asked more than a dozen people, right? Yes. Okay. Now, is there any evidence that she asked the administrators, some dean at the school, to find her a chair for her PhD committee? Indirectly, I guess, is my answer. She filed a formal grievance with Dean Bullis, who was the dean of the College of Education, and he rejected that, calling it frivolous, and said it was her responsibility to find a replacement chair, and if she couldn't, she's not going to get a PhD. She couldn't, and she, unless this case is successful, isn't going to get a PhD or an opportunity to earn a PhD, because without the dissertation committee to approve the plan for the PhD dissertation, and then the dissertation itself, once it's completed, you can't earn the PhD. Okay. So, counsel, here's what is troubling me about this case. I understand the case. You're saying that the first act of retaliation is when the PhD supervisor, having been criticized by his student, responds by saying, then I resign as her professor. The implication of that is that, even though one might do that, since the role between teacher and student in that circumstance would be extremely important, one of trust and fairness and the like, and those relationships are notoriously often fraught, that under Title IX, he does so at risk of being accused of retaliation, as opposed to saying, I shouldn't be your master professor. If that was all, I think it would be an issue of fact, frankly, as to what his motivation was. Okay, if that were all an issue of fact, we'll deal with that case perhaps another time. So that's what I'm concerned about. What else is there beyond what Ms. Imeldi is saying herself? In other words, you say she went out and talked to other professors who turned her down. Is there any evidence from any of those other people? Is there any evidence besides her characterization of what her problems were beyond her own statement? Well, there is. You say, for example, that there was this statement by Dr. Horner to a group of people who said she shouldn't get a Ph.D. Is there any evidence from anybody at that meeting who heard him say that? We do not have a direct affidavit from any of the people who were present. We have Ms. Imeldi's affidavit. That she wasn't there. That's right. Okay, so. And I believe that's an admission. I believe it's admissible. Admission? He didn't, I mean, it was her characterization of what he said. He said he doesn't recall saying that. So why is it an admission? If she puts words in his mouth that he can't recall saying, why is that an admission? Well, she is told that he made that statement. Told by whom? Well, by a professor named Cindy Herr. And did she? She did not provide an affidavit. There's no evidence from her, is there? No. No. Okay. Then, I'm using up all my rebuttal here, and I'd rather not do that. But I just wanted to emphasize that the Dean Bullis, in responding to the formal grievance, says, you know, we're not going to discuss this in terms of discrimination. And you've lost your advisor, and unless you find someone else, then you're not going to get the degree. I do want to point out one thing, because I think that this is a mistake in the appellee's brief, in which they say that she did not provide evidence in response to the summary judgment notion about all of those people she contacted. That was not disputed. There was no dispute in this case, but that she contacted all those people and they all refused to serve. But their statements as to why they did it, they said they weren't the proper person, they didn't know her field. That's all different answers, yes. Okay. Nobody said because you accused Dr. Horner of not treating you fairly as a female. That's for certain. Okay. Thank you. All right. May it please the Court, Denise Fjordbeck on behalf of the University of Oregon. As the Court has noted, the substantive issue here is whether there was evidence that was presented in the record as to whether the university retaliated against Ms. Imeldi because she engaged in protected activity. And the fact of the matter is that Ms. Imeldi never presented such evidence. In fact, her case, in essence, is built on her speculation that that was what had occurred. What is in the record, and specifically in the supplemental excerpts of record that we filed, starting at page 63 is a lengthy e-mail from Ms. Imeldi to Dr. Horner, essentially saying that your concerns about the direction that my dissertation is taking are unwarranted. Also in the record is, beginning at page 61, is Dr. Horner's response to that. And all of this does come in the context of Ms. Imeldi had gone to Dr. Friestad, who is a vice president for graduate studies at the university, not in the College of Education, but actually in the graduate school, and had complained that she felt that Dr. Horner was a barrier to her progress. Dr. Horner then, at that point, had from her, directly from Ms. Imeldi, an e-mail stating, your concerns are unwarranted, and here are essentially eight or ten pages explaining why. A communication from Dr. Friestad saying that Ms. Imeldi has come to see me, and she's concerned that you're a barrier to her getting her Ph.D. And then on page 61 of the supplemental excerpts, Dr. Horner's e-mail to Ms. Imeldi essentially saying, I don't want to hold you back. If you feel that I'm doing that, I don't want to serve you. What page are you on? Page 61, and continuing on page 62 of the supplemental excerpts of record that were filed by the appellees. I'm looking at them, just trying to get up on the page. And it's at the bottom of the page. Your message is clear that you see my feedback as a barrier to your progress and not helpful. I do not wish to be a barrier to your advancement. We have a difference of opinion as to your research plan. And after serious thought, I believe the only logical move is for me to resign today, as of today, as chair of your committee. Counsel, Judge Gould, if I could ask you a question about that. Yes. Let's assume that standing alone, a faculty member in his position can freely resign and, say, find someone else. Does the school administration, do they have no obligation to designate a chair of a Ph.D. committee when someone's been a student in their school in a Ph.D. program? I mean, can they, as apparently Dean Bullis said, just say, well, it's up to you, find someone or you're out? Or do the administrators at the school have to do something to make the climate more workable for the student? Well, there's no evidence that the university had such an obligation. Certainly, Ms. Imeldi thought that they did have. What is in the record on that issue is that Ms. Imeldi essentially sent a bulk e-mail to a number of people within the education college and asked them if they would be willing. The other thing that's in the record, again, in the supplemental excerpts, is an affidavit from, or a deposition expert from Dr. Jeffrey Sprague, who did work in the area that Ms. Imeldi was interested in, and he deposed that he would have been willing to consider serving as her dissertation chair but was never asked. And so there's at least one person that everyone agrees was qualified to do this who was not asked to do it. My question is, and I ask this trying to figure out what the standards should be in an area of the law where we don't appear to have much prior precedent. My question is, what obligation does the administration of the school have to take actions that are conducive to the progress of, let's say, women Ph.D. candidates? It sounds like Dean Bullis' memo says that we don't have any. It's not up to us, sink or swim, find your own chair. And now you're able to argue there's someone she didn't ask who would have done it, but why didn't the administration at that time go out and find this person who would do it? In other words, procedurally, why should this be here in this context? I think our position would be that because the relationship between a graduate student and her dissertation chair, it does tend to be a very close relationship. It tends to be close both personally in the sense that they work together very closely and also close professionally in the sense that the chair of the dissertation committee has to be someone who has relevant knowledge and experience to be able to guide that person, that it really is up to the graduate student to find someone who, in other words, she has a proposal here. She has a specific proposal of what she wants to do. And she notes in that proposal, and it is in the excerpts of record, that there are three people within the special education program who have relevant experience, those being Dr. Horner, who resigned, Dr. Sprague, who wasn't asked, and someone whose first name is Roland, whose last name, quite frankly, I've forgotten, and I don't know that there's any further evidence in the record about that. But, in other words, Ms. Imeldi is saying, before Dr. Horner resigned, that here are three people that I would like to have on my committee who have relevant experience and could work with me, and then we learn, and it's not disputed, that she never asked Dr. Sprague, who was one of those three people, if he would be willing to work with her. And in his deposition, he says, in essence, she never asked me. Had she asked me, I certainly would have considered working with her. Right, and so what I'm still trying to get at is, in this developing area of the law, is there an obligation on the school administrators to try to help her find someone? And I grant, normally it's going to make most sense if a Ph.D. student can sort of recruit in their own Ph.D. committee chair, because they're doing a project of interest to them. But if someone files a grievance with the school administration, and they say, my chair quit because I complained that he wasn't receptive to women, or maybe I'm overstating it, but if they say something like that, and they say subsequently I've tried but not been able to find a chair, does the administration have some obligation to do something rather than just say, you know, find your own chair or you're out? Well, I guess I would be reluctant to have the court say that in a situation where there is no evidence that, in fact, he resigned in retaliation for her expression of gender discrimination in that he had no knowledge of the contents of the memorandum that she had authored to Dean Bullis about that, nor did, and both he and Dr. Freestad say that Dr. Freestad did not tell him that the complaint that she was making was about gender discrimination. And so it's difficult to me, for me to see how you could, how the court could impose a legal obligation on the university to do that in a situation where, in fact, there's no evidence of gender discrimination. If we were in a situation where, in fact, that causal link was there, I suppose one remedy that the court might potentially impose would be university help her do this, help her find someone. But the difficulty here is that the causal nexus between her alleged statements, and there's dispute about what she said to Dr. Freestad, but there's no dispute that, or at least both Dr. Freestad and Dr. Horner say it was not communicated to Dr. Horner that her complaint was about gender discrimination. Her complaint was that he was not sufficiently available to her, that she felt that he was- Or Freestad say, but she says that she told Freestad, and we have to look at her evidence, I think, on a summary judgment. She says she told Dr. Freestad he treats male candidates different than women candidates. Am I wrong about that, or- Well, but the- Isn't that- She does say that, but- As a premise, that that is what occurred in the discussion she had with Freestad. Well, even assuming that that's the case, Judge Gould, there's no evidence that that was ever communicated to Dr. Horner. And Dr. Horner is the one that allegedly undertook the retaliatory act of resigning as her committee chair. And I understand that Freestad says, I didn't tell Horner that, right? That was her- And that was her testimony, and that was his testimony. Okay. But he did resign immediately. Well, I think if you look at our supplemental excerpts of record, he resigned immediately after getting, essentially after three things happened, after getting a lengthy memorandum from her, essentially saying, I'm not happy with my relationship with you. And she did not say that she felt that the problem was due to any kind of discrimination. She did say she was unhappy about him controlling her contact with other faculty, that she felt he wasn't spending enough time with her. None of that was connected to discrimination. And so he has a memorandum from her saying, I'm really unhappy with you. He schedules a meeting with her to which she does not come. And at about the same time, he has the communication from Dr. Freestad saying, she's unhappy with you. And that's the context, then, in which he resigns. And how long after he got the communication from Freestad that was it before he resigned? Was that the same day? Is that right? I don't believe that that's the case, no. Was it a few days? It was. So what's the general relationship? The general relationship here is that we have the communication from her, which is dated November 12th. The meeting that was scheduled with her to discuss her concerns was November 19th. She didn't come to that meeting. And on that day, he then sent the email resigning as her dissertation chair. And I believe that the conversation with Dr. Freestad is somewhere in the middle. And so we have a period of about a week where a number of things happen. And my time has run down. All right. Thank you. Judge Gould, did you have further questions? No. I guess nothing I can—I don't want to pinpoint without more study of the record. Okay. Thank you. All right. Your Honor, I'm just going to clear up a couple of facts quickly. The mention of Dr. Sprague as a potential resource was made before the Horner resignation and before Dr. Horner told the faculty that she shouldn't get the degree. And to the extent that that's relevant, it was to Ms. Imeldi in choosing not to go back to him and ask him if he would be the chair. I'm sorry. Could I just understand? It is confusing without the timeline here. You're saying she did solicit a number of people who all turned her down? Yes. Okay. But Sprague was not one of those at that time. Sprague was not one of those. And you're saying the reason she didn't contact Sprague was— That's not in the record, unfortunately. It's why she didn't contact Sprague. Well, you just gave us representation as to sequencing. That's right. Okay. The sequence was that her suggestion that he would be qualified was made before the whole blow-up occurred. Well, that's why I'm confused. You're saying that she didn't go to him because by then Horner had poisoned the well with his supposed statement, but yet she did send an e-mail out to 12 people. Did she know that those 12 people weren't there so they hadn't been poisoned by that statement? Is that what you're suggesting? No. Okay. So why not Sprague? It still doesn't make me understand. Well, there's nothing in the record that would show— The fact is that Dr. Sprague said that he would be willing to do it in a deposition months after the lawsuit was filed. She named him as one of three who were specialists. Counsel was suggesting, as I understand it, that it wasn't just a question of the school digging somebody up for her. She did have at least three people that she herself had identified, and I'm just trying to understand— Well, Horner's one of them. There's no record— Well, I understand. I just—I'd like to say I'm not a potted plant. I do follow the arguments. Horner, as you said, Sprague, and somebody named Roland or something. Sprague, she identified your saying that she had a reason, not in the record, for not sending it to him, although you speculated or cited the fact that maybe it was because he had made these statements to the other faculty members. And I'm just trying to understand, if I understand that that's correct, am I getting the gist of your argument? You are. Okay. That's all I wanted to get. You are. It's undisputed, and it's important here to note this, I think, that Horner was himself kind of imposed by the institution. When we talk about— All right. Counsel, you're going way beyond a rebuttal now. This is now re-arguing your case. Okay? It's in your briefs. We've got that. All right. Thank you. Okay. Thank you. All right. The case argued is submitted. It's an interesting and difficult case, so we appreciate counsel's argument. And we will stand in adjournment for the day.
judges: Fisher, Gould, Paez